## Gorman *v.* Miller, Appellant.

*Landlord and tenant—Covenant by landlord to erect a building—Measure of damages—Damages.*

Where a landlord has covenanted in the lease to erect a building on the demised premises for a particular purpose in accordance with particular plans, and he has failed to erect a proper building in accordance with the covenant, the measure of damages to the tenant is the difference between the rental value of the premises in the condition in which they remained, and that which they would have been in, had the landlord's covenant been performed.

In such a case if the tenant relies entirely upon the landlord making good his covenant, and pays his rent regularly in order to avoid a distress or other

process for collecting it, he may thereafter maintain an action of assumpsit against the landlord to recover the excess of rent paid. If in the action thus brought the landlord testifies that the tenant had agreed that the work was satisfactory, and that a retained balance might be paid the contractor, and this is denied by the tenant, the case is for the jury.

Argued Jan. 19, 1904. Appeal, No. 18, Jan. T., 1904, by defendant, from judgment of C. P. Lackawanna Co., Jan. T., 1900, No. 362, on verdict for plaintiff in case of H. S. Gorman and Vina E. Payne, trading as H. S. Gorman & Co., v. John S. Miller. Before RICE, P. J., BEAVER, ORLADY, SMITH, POR- TER, MORRISON and HENDERSON, JJ. Affirmed.

Assumpsit to recover excess of rent paid. Before DUN- HAM, P. J., specially presiding.

The facts of the case are stated in the opinion of the Su- perior Court.

*Error assigned* amongst others was in refusing binding in- structions for plaintiff.

*I. H. Burns,* with him *H. D. Carey,* for appellant, cited: Harlow & Co. v. Homestead Boro., 194 Pa. 57 ; Filbert v. Philadelphia, 181 Pa. 530.

*Ralph W. Rymer* and *Joseph O'Brien,* with them *M. J. Martin* and *Roswell H. Patterson,* for appellee : Schuylkill Navigation Co. v. Thoburn, 7 S. & R. 411; Fairman v. Fluck, 5 Watts, 516 ; McCrelish v. Churchman, 4 Rawle, 26 ; Warner v. Caulk, 3 Wharton, 193 ; Harvey v. The Lackawanna & Bloomsburg R. R. Co. 47 Pa. 428 ; Prescott v. Otterstatter et al., 79 Pa. 462 ; Prescott v. Otterstatter, 85 Pa. 534.

OPINION BY BEAVER, J., January 17, 1905 :

In a lease made by defendant with the plaintiffs occurs this clause : " That the said party of the first part does hereby lease, demise and let unto the said parties of the second part, a brick barn to be built on the rear of his lot on the southerly side of Spruce street, in the city of Scranton, county of Lackawanna and state of Pennsylvania, between Breck and Forest courts, together with the ground upon which the same is to be erected. The said barn to contain three stories and basement and to be 100 feet long on the said courts, and forty feet wide, and to be

completed and ready for occupancy, in accordance with the plans and specifications prepared by Norman Rutherford, on the first day of January, 1899."

Among the specifications referred to, under the head of " Floors," is the following: " The floor of the basement will be laid of two-inch old plank and stalls to be double planked. The floors of first and second stories will be of No. 1 southern pine two inches thick, surfaced and grooved for a hard wood tongue of ½ by 1 inch oak, and both grooves and tongues to be well painted with white lead and linseed oil before being nailed, then all to be well nailed. These floors must be water-tight. The stalls and box stalls to be double planked with old two-inch plank, as directed.

" At the rear of all stalls on second floor will run a gutter— (No. 262–P) with trap (No. 266–P) and all to be made water-tight."

In the course of the erection of the building, as clearly appears from the testimony, the plan of the second floor was changed by direction of the city building inspector, by which the center of the said floor was raised by what is called by one of the witnesses a center crown, so that the drop of the floor, instead of being toward the center, was changed so as to be toward the sides. The heads of the horses, as they stood in the stable, were toward the sides and their hinder parts toward the center. This change in the plan of the floor necessitated a complete change as to the gutter.

The subcontractor for the woodwork, during the course of the construction of this floor, called the attention of the defendant to it and advised him that it would not be water-tight but that he could so construct it, without any additional cost to the defendant, as to make it water-tight. His testimony upon this subject is very clear and explicit. In the cross-examination of the defendant it is admitted that Moyer, the subcontractor, had suggested the change and the reasons for not permitting it are given. Among other things, he said:

" Q. So the reason you didn't let Frank Moyer make the change when he suggested it, so as to make it water-tight under the plans and specifications—the reason you didn't permit him to make that was because you thought he was going to make some money out of it? A. The reason was I only

had his story for it, and we had the contractor and the architect and everybody else on the other side. The main reason was that he couldn't get the yellow pine at the time, and we was delayed a month on account of his not getting the yellow pine, stopped the whole building; and to remedy that he wanted to change the floor from a four-inch floor with tongue and grooves and painted and put in a two-inch floor. He wanted to change it from four inches to two inches, and he said that would. be water-tight. In the first place, he said the other would be water-tight and, when he couldn't get the lumber, he said this would be water-tight and I didn't believe anything he said, and I told him I wanted to have it done according to the contract, and I wouldn't permit any changes."

Afterwards, on having his attention called to the thickness of the floor, as required by the specifications, the defendant said: "It should be two inches instead of a four-inch floor; I am mistaken about that; it is two-inch instead of four-inch floor; I am mistaken in the thickness of the floor."

The importance of having a water-tight floor was due to the fact that the ground floor, which was immediately under the floor in question, was to be occupied by carriages and other vehicles which it was necessary to protect from any droppings from above. The evidence shows clearly that the second floor, used as a horse stable, was not water-tight, and that it began to leak the day following its occupancy. The attention of the defendant was called to it and he undertook to remedy it at different times and in different ways which he details in his testimony. It would seem from the testimony that the plaintiffs relied entirely upon their agreement with the defendant and upon the defendant's efforts to remedy the defect which became apparent as soon as the stable was occupied. They paid their rent regularly and brought this action to recover damages for the failure of the defendant to make good the stipulation in the specifications referred to in the lease, that the floor must be water-tight.

It is not necessary to stop to discuss the question as to whether or not the stipulation for a water-tight floor is part of the plans and specifications referred to in the lease. The specifications as to materials to be used and the manner in which the floor was to be laid seem to have been carried out, but the

plan was changed in its most essential part, that is, the floor instead of draining toward the center was changed in such a way, under the direction of the building inspector of the city, that the drainage was in an opposite direction. It was, therefore, practically impossible, as ought to have been apparent, to properly drain the floor without suspending the natural law of gravitation. The effect of this change was communicated by the subcontractor for the woodwork to the defendant, but he testifies that he did not communicate it to the plaintiffs and there does not seem to be evidence that the attention of the plaintiffs was called to it.

The testimony in regard to the damages suffered by the plaintiffs is voluminous, full and clear and was fairly submitted to the jury.

Two principal questions are raised by the specifications of error: Was the measure of damages correctly laid down by the court? Was the testimony in regard to the plaintiffs having given notice to the defendant that they were satisfied with the building, so as to induce the defendant to pay the contractor, of such a character as to warrant the court in taking the case from the jury.

The first eight assignments of error are to the answers of the court to the points for charge, as presented by the defendant. In view of the facts, as we have stated them, gathered from a very careful reading of the evidence, it is clear that a number of the points were based upon a one-sided statement of the facts which could not be accepted by the court, in view of which we are unable to discover any error whatever in the disposition of the points, as made by the court below.

The ninth assignment alleges error in regard to a portion of the charge of the court, which is as follows: "If, after considering all these things, you find that this barn was not put in the condition in which Mr. Miller agreed to put it, and that Mr. Gorman has been damaged, you will find a verdict in favor of the plaintiffs for the amount of damage they have suffered, that is, for the loss in the rental value of the property from the time he took it up to the time suit was brought; or, in other words, for the difference in the rental value of the property as he was compelled to take it, and add interest to that up to the present and give a verdict in favor of the plaintiff for that amount,

unless you find that the plaintiff is estopped from setting up a claim by the representations he made to Mr. Miller. If you find he made those representations, then you will render a verdict in favor of the defendant." Was the measure of damages herein suggested the proper one, under the circumstances?

1. As to the measure of damages. The court evidently followed the rule, as laid down in Fairman v. Fluck, 5 Watts, 516, in which Mr. Justice SERGEANT said, in reference to the question of the proper measure of damages: "It ought to be the difference between the worth of the premises in the condition in which they remained and that which they would have been in, had the landlord's covenant been performed; or, in other words, so much less as they would have rented for without the covenant. In Schuylkill Navigation Company v. Thoburn, 7 S. & R. 411, the plaintiff's factory was overflowed by the erection of a dam in the Schuylkill and, in proceedings under the act of assembly, it was held that the measure of his damages was not what he might suffer in his business, or by the consequences of the injury, but the difference between the price the property would have brought unaffected by the obstruction and what it would have produced when the injury was done." This was the rule followed by us in Jackson v. Farrell, 6 Pa. Superior Ct. 31. In that case we said, basing our conclusion upon Peterson v. Haight, 3 Wharton, 150, and Warner v. Caulk, 3 Wharton, 193, the covenant in that case being for the removal of a building from one location to another and fitting it for the occupancy of the tenant: "Admitting that the covenant on the part of the plaintiff to move the building occupied by the defendant to the board walk, thereafter to be erected, was a part of the agreement for the lease of the building, and admitting also the failure of the plaintiff to comply with his agreement, after notice and request by the defendant, two (three) courses were open to the defendant. He could have moved the building, in accordance with the terms of the agreement, and defalked the cost of moving it from the amount of the rent, or he could have surrendered the possession, or offered to surrender it, and have relieved himself from the payment of the rent, or he could have retained the possession and deducted from the rent the difference between the rental value of the store room as it would have been, if the

stipulations of the agreement, as alleged by him, had been complied with, and its rental value as occupied by him." So here, three courses were open to these plaintiffs. They could have repaired the floor and defalked the cost of making those repairs from the amount of the rent, but they were not bound to do so here because the defendant undertook to do it, or they could have surrendered the possession, or offered to surrender it, and have relieved themselves from the payment of the rent, or they could have retained the possession, as they did, and deducted from the rent the difference between the rental value of the stable as it would have been, if the stipulations of the agreement had been complied with, and its rental value as occupied by them. They relied entirely upon the defendant to make good his covenant as to the character of the stable floor. They paid their rent regularly, in order, it is to be presumed, to avoid a distress or other process for collecting it, and, therefore, had the right, as is clearly intimated by Mr. Chief Justice GIBSON, in Warner v. Caulk, 3 Wharton 193, to recover the excess of rent paid, by their present action. It is said in that case: " When he has not paid the increment of a previous quarter, let him pay it when demanded and no more ; but, if he has voluntarily overpaid it or suffered too much to be recovered of him, I know not how he may regain the excess, unless by action of covenant." See also Prescott v. Otterstatter, 85 Pa. 534.

2. The tenth assignment is that "the evidence that Gorman agreed that the work was satisfactory and that Miller might pay the retained balance to Sykes, the contractor, is undisputed. The court, therefore, erred in not giving binding instructions for defendant." The facts as to this phase of the case are not correctly stated. The testimony of Miller and Sykes in regard to the fact therein stated is disputed by Gorman, and, even if this were not the case, the jury had a right to pass upon the credibility of the witnesses and the question was, therefore, for the jury and was properly referred to them, and it was as to this point that the court said: " If you find he made those representations, then you will render a verdict in favor of the defendant."

A careful review of the entire case fails to disclose any reversible error and the assignments are, therefore, all overruled.

Judgment affirmed.