## Frisch v. Fernwood Terrace, Inc.

*Michael J. Piosa,* for plaintiffs.
*E. Keller Kline, III,* for defendant.
*Dennis A. DeEsch,* for additional defendant.

WIEAND, *J., Specially Presiding,* November 13, 1980—This action in assumpsit is based upon an alleged breach of an implied warranty of habitability. It is contended that such a warranty exists where, as here, plaintiffs purchased a development lot from defendant and subsequently contracted with defendant for the construction of a

dwelling thereon. Plaintiffs concede and have stipulated that the dwelling was built in a good and workmanlike manner and in compliance with all applicable building codes. They contend, however, that an implied warranty of habitability was breached when water entered the basement and interfered with their use of the basement for storage purposes. The issues to be determined, following trial without jury, include: (1) whether the transaction in question included an implied warranty of habitability; (2) if so, whether it could be and was waived; and (3) in any event, whether such an implied warranty, if it existed, was breached under the circumstances of this case. These questions are novel and complex.

By deed dated June 24, 1975 defendant, Fernwood Terrace, Inc., conveyed to Thomas E. and Rosemary T. Frisch a vacant lot located in Fernwood Terrace, a larger tract being developed by said defendant. The parties did not then enter an agreement for the construction of a home on the lot because plaintiffs had expressed a desire to consider other contractors for that purpose. On July 29, 1975, however, a written agreement was executed between the parties for the construction by defendant of a single family dwelling according to attached plans and specifications. The agreement contained, inter alia, the following warranty provision:

"8. *Warranty.* Seller agrees that the house which it constructs on the subject lot will be built in a good and workmanlike manner and that all materials used will be new and of standard quality, free from defects. Seller warrants and agrees that for a period of one year after final settlement is made, it will, at its expense, repair or replace any defective

materials or workmanship, provided, however, that Seller reserves the right to charge Buyer the sum of $25 per service call for any unwarranted request for repairs not covered by this Warranty. The parties expressly agree that Seller's liability in that regard shall be limited to such cost of repair or replacement and that Seller shall not be responsible for any further claims for damages of any kind, direct, indirect or consequential. The parties further agree that the warranty herein contained does not cover outside improvements such as seeding of lawn, does not cover ground or concrete subsidence, and does not cover any item for which there is a manufacturer's warranty. Where there is a manufacturer's warranty for any item, Seller shall deliver same to Buyer at settlement. Except for the warranties contained in this paragraph, there are no other warranties of any kind, express or implied, and Buyer hereby specifically waives any such other warranties and agrees that the warranties which are contained herein are personal to the Buyer and not transferable."

The home was constructed in a good and workmanlike manner, and plaintiffs moved into the completed home in January, 1976. During rain storms, plaintiffs observed water entering their basement through small air spaces surrounding tie rods inserted in the poured concrete basement. The number of tie rods evidencing the entry of water increased as time passed, as did the amount of water. Ultimately, the water also seeped into the basement at the joint between the floor and the walls. When plaintiffs called this problem to defendant's attention, workmen were dispatched to do patchwork aound the tie rods. This happened on several occasions. In January and February, 1978

rainfall was heavy, and water accumulated in plaintiffs' basement. Thereafter, plaintiffs contracted with Associated Desert-Dry Waterproofing Contractors, Inc., which installed a system designed to provide relief from hydrostatic pressure. The cost of this installation was $2,700. Since completion of such installation, plaintiffs' basement has been dry.

Plaintiffs contend that their home was rendered uninhabitable by a water table which rose during periods of rain to exert pressure on the walls of their basement. They seek to recover from defendant the cost of correcting this condition and also the cost of replacing a basement cedar closet damaged by water.

Ms. Ellie Cyr, a geologist, was employed by defendant to make excavations to determine whether plaintiffs' water problem was being caused by a high level of subsurface water. As a result of her examinations she expressed the opinion that the water entering plaintiffs' basement was not the result of a high water table. The soil evidenced, she said, that the water table had never been as high as the floor of plaintiffs' basement. Defendant argues, inter alia, that the water entering plaintiffs' basement was surface water, which was eliminated when fill was impacted tightly around the exterior of the basement walls.

In Elderkin v. Gaster, 447 Pa. 118, 288 A. 2d 771 (1972), the Supreme Court held that a builder-vendor who sells new homes in a development impliedly warrants that the home he has built and is selling is constructed in a reasonably workmanlike manner and that it is fit for habitation. Citing and quoting from Kellogg Bridge Co. v. Hamilton, 110 U.S. 108, 28 L.Ed. 86 (1884), the court said at 128:

"Not only does a housing developer hold himself out as having the necessary expertise with which to produce an adequate dwelling, but he has by far the better opportunity to examine the suitability of the home site and to determine what measures should be taken to provide a home fit for habitation. As between the builder-vendor and the vendee, the position of the former, even though he exercises reasonable care, dictates that he bear the risk that a home which he has built will be functional and habitable in accordance with contemporary community standards."

The facts of Elderkin make it clear, however, that an implied warranty of habitability arises only in sales of homes by builder-vendors, i.e., those who buy land and build homes upon the land for purposes of sale to the general public. The facts appear at page 123, 288 A. 2d at 774, as follows:

"The record plainly shows that the appellee was a real estate developer and was the builder-vendor of appellants' residence. Although the sale of the lot and home was consummated in a two-step process, it is clear that the basic agreement between the parties was that appellee would furnish appellants, for an agreed consideration, a home located in appellee's development. In fact, appellants could not have moved into the development had they not agreed to purchase *both* the house and lot from appellee. Accordingly, we direct our attention to whether any warranties are implied by a builder-vendor when he sells a 'single-package'—a new house and a lot—to his customer." (Emphasis in original.)

The facts in the instant case are different. Here, defendant sold and conveyed a building lot from its

development to plaintiffs and gave them the opportunity to engage the services of any contractor they might select. When plaintiffs selected defendant as the contractor, they were represented by counsel who reviewed and approved the proposed construction contract. That contract defined specifically the warranties made by defendant and just as specifically eliminated any other warranties, express or implied.

Under these circumstances, we are constrained to hold that the rights of the parties must be determined by their written agreement. A court of law cannot rewrite the parties' agreement by inserting a warranty which the parties expressly excluded. Plaintiffs argue that an implied warranty of habitability is nonwaivable by a vendee. An attempted waiver, it is argued, is against public policy and should not be permitted because of the unequal bargaining power between developer-vendor and vendee.

In Pugh v. Holmes, 253 Pa. Superior Ct. 76, 384 A. 2d 1234 (1978), the Superior Court abolished the common law doctrine of caveat emptor as it applied to residential leases and held that an implied warranty of habitability existed in all such leases. In Fair v. Negley, 257 Pa. Superior Ct. 50, 390 A. 2d 240 (1978), the Superior Court held that the implied warranty of habitability could not be waived by a tenant where the bargaining power between landlord and tenant was unequal. The concurring opinion of Judge Spaeth made it clear, however, that the court did not intend to preclude a bona fide agreement wherein parties of equal bargaining power negotiated their own warranty provisions.

In the instant case plaintiffs were the owners of a building lot and could negotiate their own agree-

ment with any contractor selected to construct a home thereon. They selected defendant, and in their negotiations with defendant were represented by counsel. The reasons for the Fair rule of non-waivability, therefore, are not present here. The parties were able to negotiate their own contract and, doing so, wrote the warranty which appears in paragraph 8. There is no policy reason for refusing to enforce the provisions of the agreement executed by the parties. See Tibbitts v. Openshaw, 18 Utah 2d 442, 425 P. 2d 160 (1967).

Plaintiffs have also failed to prove that their dwelling was rendered uninhabitable by the condition of which they complain. The water entering their basement was not caused by a high and rising water table which rendered the lot unsuitable for constructing a dwelling thereon. The testimony of defendant's geologist demonstrated this fact unequivocally. It was also confirmed by the manner in which water initially entered the basement, i.e., from areas surrounding the tie rods located at elevated spots on the basement walls. This is suggestive that it was surface water which was entering the basement and not a high water table.

In Elderkin v. Gaster, supra, an implied warranty of habitability was breached when a well drilled by a builder-vendor failed to produce a potable water supply. The conclusion reached in that case was clear, for a dwelling cannot be used for modern living purposes without an adequate water supply. The court noted, however, that what is "'habitable' is not easily defined and must be approached on a case by case basis." Id. at 127, fn. 13, 288 A. 2d at 776, fn. 13. See also Mulhern v. Hederich, 163 Colo. 275, 430 P. 2d 469 (1967).

The facts in the instant case disclose that plain-

tiffs' dwelling was not rendered uninhabitable. The basement of their home had not been "finished" under the terms of the contract. It simply was not intended for use as living quarters. Instead, the basement was to be used and was used for storage, a use made more difficult but not precluded by the entry of water during rainy weather. The entry of water into basements of newly constructed homes during periods of heavy rains is not a new or even unusual phenomenon. Frequently it is the result of defective workmanship. Always it is extremely annoying to the property owner. It is not every wet basement, however, that renders a dwelling uninhabitable.

Plaintiffs concede that their home was constructed in a good and workmanlike manner and that there have been no breaches of the express warranties contained in the written construction agreement. They ask this court to impose upon the contractor absolute liability for water entering their basement. This is not required by existing principles of law and would be a clear and far-reaching extension of the principle established by Elderkin. We will not take this step, with its potentially chilling effect on the construction of new homes, without a clear mandate from the appellate courts. Meanwhile, the parties to building contracts can protect themselves against wet basements by the terms of their construction contracts.

In this case, our finding is in favor of defendant. In making such a finding, we are not unsympathetic to plaintiffs' plight. Our holding is a narrow one. We hold merely that under the facts of this case liability without fault cannot be imposed upon defendant.

The additional defendant performed the base-

ment concrete work. He was joined as an additional defendant so that he could be made to respond in damages for any defective work. As previously noted, plaintiffs have stipulated that the basement was constructed in a good and workmanlike manner. Consequently, there can be no recovery against the additional defendant.

## ORDER

Now, November 13, 1980, the attached adjudication is directed to be filed, and if no exceptions are filed within ten days after notice thereof has been given to the parties or their attorneys, judgments may be entered in favor of defendant and additional defendant.